UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

STEVEN-AZZIZ EL BEY,           Case No. 1:19-cv-693

    Plaintiff,

                                                  Dlott, J.
        vs.                                       Bowman, M.J.

THOMAS KEHR, *et al.,*

    Defendants.

**REPORT AND RECOMMENDATION**

On August 1, 2019, Plaintiff filed his complaint alleging violations of his rights under the free exercise clause of the First Amendment, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA) against five individuals and numerous grounds for relief. (Doc. 1). This matter is now before the Court on Defendants' motion for summary judgment and the parties' responsive memoranda (Docs. 18, 19). The motion is well-taken.

    **I.**     **Background and Facts**

While housed at the Warren Correctional Institution ("WCI"), in Lebanon, Ohio, Plaintiff alleges that he is a member of the Moorish Science Temple of America ("MSTA). (See Doc. 1, at PageID 2). MSTA is a national and religious organization founded by Noble Drew Ali. (Doc. 15, Aff. Davis at ¶12). The organization believes that African Americans are descendants of the Moroccan Empire and Islamic by faith. Id. The organization is a subsect of the Islamic faith. Id. To join the organization, its members must proclaim their Moorish nationality and are given a nationality card to signify their new citizenship. Id.

Since the early 1990s, MSTA members started to proclaim a Moorish sovereign citizen identity that they have special rights because of their Moorish status or because they are aboriginal and indigenous inhabitants of North America. Id. At WCI, there are a total of 136 men (self-identified) that practice some form of Islam at the WCI. (Doc. 15, Aff. Davis ¶ 7). An Imam, who is an approved contractor with WCI, currently provides non-secular Islamic services at WCI. Id. The Imam is contracted to serve the Hanafi, Sunni, MSTA, Nation of Islam, Nation of Gods & Earths, and Black Muslims. Id.

Per Ohio Department of Rehabilitation and Correction ("ODRC") policy 72-REG-01 Institutional Religious Services, all contract religious providers shall be advised that they should appeal to the broadest range of adherents in the faith group. (Doc. 15Aff. Davis at ¶ 7; Exh. A). To become an approved religious provider (volunteer), each individual must submit the necessary paperwork and then typically be interviewed by the Chaplain and/or Deputy Warden of Special Services. (Doc. 15, Aff. Davis at ¶ 9; Exh. A). In addition to the Deputy Warden, religious services contractors are also typically reviewed by the Religious Services Administrator. Id. The contractors respond to ODRC open bids for service providers. Id. The provider must be in good standing within a congregation or credentialing body. Id. The provider must provide evidence of the support of their congregation/credentialing body. Id. All ODRC Islamic providers are contracted with the agency. Id. All approved religious providers and contractors must emphasize the common, fundamental teachings of the faith. Id. Followers of MSTA adhere to the Koran and the teachings of founder Noble Drew Ali. Id. The Imam is advised to refrain from sectarian teachings. Id. Since there is an Imam that serves the Muslim population at WCI, a provider for the specific MSTA population of twelve is not permitted, and permission of

such raises significant security concerns. Despite this, inmates are permitted to have a Minister of Record. (Doc. 15, Aff. Davis at ¶ 8; Exh. B). The Minister of record designation allows for special visitor status to visit the inmate. Id. An individual can have a Minster of Record that is allowed to provide sectarian teachings on a one-on-one basis.

Plaintiff contends that between May 12, 2017 and an unspecified time after January 24, 2018, he communicated with Defendant Kehr about receiving religious services at WCI in accord with his religious preference of Moorish Science Temple. (Doc. 1, at PageID 2-6). Plaintiff claims that a Moorish Science volunteer provided religious services at WCI on November 22, 2017, but that the volunteer had been approved as a guest only. (Doc. 1, at PageID 4; Exh. C).

On September 14, 2017, Plaintiff filed an informal complaint requesting religious services. (Doc. 1, at PageID 4). On September 18, 2017, WCI Deputy Warden of Special Services reviewed and denied his informal complaint as without merit. (Doc. 15, Exh. D). Plaintiff then filed a grievance related to his informal complaint on October 5, 2017. (Doc. 1, at PageID 4; Exh. D). Institutional Inspector Hill conducted an investigation, found no violation of policy or procedure, and denied Plaintiff's grievance on October 30, 2017 since there are no approved volunteer for his specific religious beliefs. (Exh. D at p. 4).

Plaintiff alleges that he was unable to timely appeal the denial of his grievance because Hill was on vacation and plaintiff did not have the appeal forms. (See Doc. 1, at PageID 4-5). Plaintiff asserts that non-defendant Suzanne Evans told plaintiff that his electronic appeal had been improperly filed. (Doc. 1, at PageID 5). Plaintiff alleges that his wife contacted non-defendant Chief Inspector Roger Wilson, who allegedly contacted

Hill. (See Doc. 1, at PageID 5). Plaintiff asserts that upon her return Hill informed plaintiff that the appeal deadline would not be an issue. (Doc. 1, at PageID 5).

Inmates seeking accommodations for a particular faith are directed to express their concerns to the Religious Accommodation Review Committee ("RARC") via an Inmate Request for Religious Accommodation Form. (Docs. 15-2, 15-3). In accordance with policy inmates must first submit an RAR to the Facility Chaplin. (See Doc. 15-4, PageID 118 for example). Per the policy, the evaluation of all RARs are the same, regardless of the religious group the inmate belongs. (Doc. 15-3.) The chaplain refers the request along with his recommendation to the institution RARC. Id. The RARC will review it and provide its own recommendation to the managing officer/designee for review and decision. The decision is recorded on the Response to Request for Religious Accommodation form and forwarded to the inmate. Id. The inmate may appeal that decision to the Religious Services Administrator. Id. However, if the inmate is requesting new dietary requests, congregate services or recognition of a religious holiday, the procedure changes slightly. Instead of the managing officer/designee making the decision, that officer/designee shall only make a recommendation to the Religious Services Administrator who, then, will make the final decision. Id. The policy is silent as to whether there is an ability to appeal the decision of the Religious Services Administrator.

Plaintiff filed a Request for Religious Accommodation form on December 6, 2017 to the Chaplain's Office. (Doc. 15-4). Plaintiff requested regular secular religious services, classes, and congregation for the members based on the constitution and bylaws of the nation and religion of the MSTA. Id. The Chaplain reviewed the request based on the policy and determined that the MSTA falls under the umbrella of Islam and

4

currently receives services from the Imam, and having their own leader or worship is not needed. Id. Although the Chaplain recommended the denial of the request, he noted that the volunteer found can be the Plaintiff's minister of record to receive individualized instruction from him. Id. However, the volunteer had not submitted all the documents required to become a minister of record at the time of the denial. Id.

Plaintiff then filed the instant action alleging violations of his rights under the free exercise clause of the First Amendment, the Fourteenth Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA). Defendants now move for summary judgment on all of Plaintiff's claims.

**II.  Analysis**

*A. Standard of Review*

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). "A fact is 'material' and precludes a grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)(quoting Black's Law Dictionary 881 (6th ed. 1979)). The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d


107, 111 (6th Cir. 1978). A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)(citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record, as it has been established, which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). "The mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the nonmovant." *Anderson*, 477 U.S. at 252. The Sixth Circuit has instructed lower courts "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *EEOC v. Ford Motor Corp.*, 782 F.3d 753, 770 (6th Cir. 2015)(en banc). In other words, "[w]hen opposing parties tell two different stories, one which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt the version of the facts for purposes of ruling on a motion for summary judgment*." Scott v. Harris*, 550 U.S. 372, 380 (2007). The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49.

Furthermore, a party asserting that a fact cannot be genuinely disputed must support the assertion by: (1) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (2) showing that the materials cited do not establish the presence of a genuine dispute. Fed. R. Civ. P. 56(c).

Thus, the moving party must "designate specific facts in affidavits, depositions, interrogatories, or other factual material" from which a reasonable jury could find in his favor. *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F.Supp.2d 846, 849 (S.D. Ohio 2011). He "cannot rest on the mere allegations of the pleadings." Id. See also id. at 851-52 (holding that a pro se party cannot rely on allegations or denials in unsworn filings when opposing a motion for summary judgment).

B. *Defendant's motion for Summary Judgment is Well-Taken.*

1. *First Amendment claim,*

To maintain a claim under § 1983, a plaintiff must establish that he was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). This is because § 1983 "is not itself a source of substantive rights," but instead merely provides "a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979). Thus, the first step in evaluating a § 1983 claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker*, 443 U.S. at 140.

7

The First Amendment guarantees a prisoner the right to practice his religion. *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989); *Bell v. Wolfish*, 441 U.S. 520, 550–51 (1979). To establish that his right to the free exercise of his religion has been violated, plaintiff must make a threshold showing: (1) that the "belief or practice asserted is religious in [his] own scheme of things"; (2) that the belief or practice is "sincerely held"; and (3) that defendants' conduct infringes upon the belief or practice. *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987) (citations omitted). The focus then shifts to "whether the challenged practice of the prison officials furthers some legitimate penological objective." *Id.* A prison regulation that restricts a constitutional right is valid if it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 84 (1987). "Of course, the determination of state prison authorities as to what are legitimate penological objectives and what regulations and practices further them is entitled to great deference." *Kent v. Johnson*, 821 F.2d at 1225 (citing *Block v. Rutherford,* 468 U.S. 576, 585, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Hill v. Blackwell*, 774 F.2d 338, 342 (8th Cir. 1985)). The Supreme Court explained that "such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner v. Safley*, 482 U.S. at 89, 107 S.Ct. 2254 (quoting *Jones v. North Carolina Prisoner's Union*, Inc., 433 U.S. 119, 128 (1977)).

Here, Plaintiff alleges that the Defendants denied him the ability to engage in secular congregate services under the Moorish Science Temple of America. As noted by Defendants, inmate religious practices, as opposed to beliefs, are subject to reasonable time, place and manner restrictions needed to preserve internal order and to maintain institutional security. *Mohammad v. Sommers*, 238 F. Supp. 806, 811-12 (E.D. Mich.

1964). The Constitution does not require that a religious advisor be provided for every sect represented in a penitentiary. *Cruz v. Beto*, 405 U.S. 319, 322, 31 L. Ed. 2d 263, 92 S. Ct. 1079 n.2 (1972) (per curiam); *see also Tisdale v. Dobbs*, 807 F.2d 734, 740 (8th Cir. 1986).

Nor does the Constitution require that prisoners be provided the religious advisor of their choice or one that belongs to their individual religious sect. *Reimers v. Oregon*, 863 F.2d 630, 632 (9th Cir. 1989); see also *SapaNajin v. Gunter*, 857 F.2d 463, 465 (8th Cir. 1988) (noting "each inmate is not entitled to his own personal clergyman"). Rather, prisoners must simply be given a reasonable opportunity to exercise their religious freedom guaranteed by the First and Fourteenth Amendments. *Cruz*, 405 U.S. at 322 n.2; *Tisdale*, 807 F.2d at 740.

Here, any burden on Plaintiff's religious exercise was reasonably related to legitimate penological interests in (1) maintaining order, security, and safety; (2) balancing inmate relationships; and (3) conserving personnel resources. The United States Supreme Court has recognized that safety and security are compelling interests. See *Cutter v. Wilkinson*, 544 U.S. 709, 722-725 (2005) ("prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area.").

WCI argues that it does not have sufficient space or staff to provide separate services and study groups multiple times per week. WCI currently houses more than six different sects of Islam alone, and therefore cannot provide the staff or space for every religious sect to meet based on limited time, resources, and chaplains or other leaders available for subsects of Islam. (Doc. 15, Aff. Davis at ¶ 10). Furthermore, WCI argues that it is not feasible or economically possible for ODRC to employ a sufficient number of

Muslim Imams for each subsect of Islam to preside at all ODRC institutions. WCI lacks adequate space for multiple Islam services and does not have physical resources to conduct separate services for each of the sects of the Muslim faith. Id. WCI also does not have sufficient security staff for conducting separate services. By tasking additional staff necessary to conduct separate services for MST and each of the sects of Muslim faith, it would require taking staff away from other essential duties and would disrupt institutional activities. (Doc. 15, Aff. Davis at ¶ 10).

Moreover, as noted by Defendants, the request for separate services raises additional security and safety concerns as it could lead to secular disputes within the institution. In this regard, Defendants note that the founder of the Moorish Science Temple of America and his predecessors expressed extreme ideals, such as W.D. Fard claiming to be the embodiment of Ali's spirit and stating that Europeans are the descendants of Satan. (Doc. 15, Aff. Davis at ¶ 12). Allowing a religion which expresses anti-government tendencies and hate towards others to promote their beliefs within an institution would create serious security concerns. As other courts have stated, a ban on religious practices that promote racism serves a compelling interest. See, e.g., *Lindell v. McCallum*, 352 F.3d 1107, 1110 (7th Cir. 2003) (prison authorities may demonstrate compelling interest in suppressing Wotanism if religion is racist)

Last, "there are ready alternatives to the prison's current policy that would accommodate [plaintiff] at de minimus cost to the prison." *Shakur v. Schriro*, 514 F.3d 878, 887 (9th Cir, 2008). Here, WCI allows Plaintiff and adherents of all faiths the opportunity to meet for secular teachings with a Minister of Record, while providing general accepted teachings at congregate services. The Minister of record designation

allows for special visitor status to visit the inmate. (Doc. 15, Ex. B). An individual can have a Minster of Record that is allowed to provide sectarian teachings on a one-on-one basis. Id. Such designation permits the teachings beyond the generally accepted teachings/principles of the faith that are required per policy. Id.

Notably, the process of designating a Minister of Record requires the outside volunteer to complete all the necessary paperwork and background checks. Id. Clergy seeking the designation must complete a Visiting Application (DRC2096) and send in a letter on letterhead stating they are the clergy of record and provide proof of professional certification. Associate or staff pastors may visit in place of the clergy of record with proper application and professional verifications. If the outside volunteer fails to complete any portion of the process, ODRC will not be able to process the application to designate as a Minister of Record. Id. The volunteer found by the Plaintiff failed to complete the necessary documents.

In sum, Defendants contend that because Plaintiff does not present any factual issues concerning the reasonableness of the restriction or its available alternatives, Defendants should be awarded summary judgment on Plaintiff's Complaint. The undersigned agrees and finds that Defendants are entitled to judgment as a matter of law with respect to Plaintiff's First Amendment claims.

2. *Religious Land Use and Institutionalized Persons Act (RLUIPA).*

Plaintiff complaint also raises claims for violations of RLUIPA . Courts considering RLUIPA claims must also appropriately balance the prison's need to maintain order and safety with the rights protected by the Act. *Cutter v. Wilkinson*, 544 U.S. 709, 722-723 (2005). Analysis under RLUIPA is a "three-act play." *Cavin v. Mich. Dep't of Corr.*, 927

F.3d 455, 458 (6th Cir. 2019). First, "the inmate must demonstrate that he seeks to exercise religion out of a 'sincerely held religious belief.'" Id. (quoting *Holt*, 574 U.S. at 361). Second, the inmate "must show that the government substantially burdened that religious exercise." Id. Upon satisfaction of these two steps, the burden then shifts to the government for the third act: it "must meet the daunting compelling-interest and least-restrictive-means test." Id.

Inmates must demonstrate that they have sincerely held religious beliefs regarding the need for communal worship. *Fox v. Washington*, 949 F.3d 270, 279 (6th Cir., 2020). An Inmate must also demonstrate that the denial of communal congregation with on members of their religious group, beyond what is already permitted to him, is a substantial burden. *Fox*, 2019 U.S. Dist. LEXIS 52008, 2019 WL 1409375, at *8 ("[H]e has not explained how congregate worship services are either required by his religion or would substantially further his exercise of that religion beyond those things already permitted to him." (quoting *Mann v. Wilkinson,* No. 2:00-CV-0706, 2007 U.S. Dist. LEXIS 94002, 2007 WL 4562634, at *4 (S.D. Ohio Dec. 21, 2007))).

Thus, no RLUPIA violation exists where generic services "structured for all Muslim inmates, not exclusively for any subgroup" were offered. *Jones v. Shabazz*, 2007 U.S. Dist. LEXIS 72640, *19, 2007 WL 2873042 (S.D.Tex); see also *Davis v. Alameida*, 2009 U.S. Dist. LEXIS 26976, 2009 WL 890723 at *5 (C.D.Cal.) (Court held that the inmate failed to show that the mere failure to provide chapel time specific to the Nation of Islam followers burdened his ability to pursue his faith).

Here, Plaintiff has failed to establish any RLUPIA violation. As noted above, Defendants offered the Plaintiff the opportunity to engage in congregate worship

12

alongside others practicing Islam. (Aff. Davis at ¶¶ 7-8; Exh. A-B). In doing so, Plaintiff is permitted to worship congregationally with others practicing Islamic faith, and alongside other WSTA members, though structured for all Muslim inmates, and not exclusively for WSTA or any sub-group. Id. Furthermore, Plaintiff is entitled to designate a specific volunteer or provider as a Minister of Record to receive individualized teachings of his subsect of Islam. Accordingly, Defendants are entitled to judgment as a matter of law with respect to Plaintiff's claims under RLUIPA. [1]

### 3. Qualified Immunity

Assuming Plaintiff has met his burden of establishing a First Amendment claim, which he has not, Defendants are entitled to qualified immunity. The purpose of qualified immunity is to provide governmental officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012 (1984). Thus, a governmental official performing discretionary functions will be entitled to qualified immunity unless his actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009). Once a defendant has raised the defense of qualified immunity, the

---

[1] To the extent that Plaintiff is asserting RLUIPA claims against Defendants in their individual capacities, such claims fail as a matter of law. *See Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014), Colvin v. Caruso, 605 F.3d 282, 288 (6th Cir. 2010); Ervin v. Davis, Case No. 2:16-cv-186, 2017 U.S. Dist. LEXIS 133371 (S.D. Ohio 2017); Green v. Tudor, 685 F. Supp.2d 678 (E.D. Mich. 2010); Pugh v. Caruso, Case No. 1:06-cv-138, 2008 U.S. Dist. LEXIS 118431 (W.D. Mich. 2008); Garrison v. Dutcher, Case No. 1:07-cv-642, 2008 U.S. Dist. LEXIS 90504 (W.D. Mich. 2008) (citing Smith v. Allen, 502 F.3d 1255, 1274 (11th Cir. 2007).

plaintiff bears the burden of proof to show that the defendant is not entitled to that defense. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005). Here, there is no evidence anywhere in the record that Defendants did anything to deprive Plaintiff of the ability to practice his faith.

### 4. Eleventh Amendment

Last, any claims asserted by Plaintiff against Defendants in their official capacity are barred by the Eleventh Amendment. Where a state has not waived its immunity, the Eleventh Amendment acts as a jurisdictional bar to a federal court lawsuit against a state. *Wolfel v. Morris*, 972 F.2d 712, 718 (6th Cir. 1992). Ohio has not waived its sovereign immunity, and Congress did not disturb the states' Eleventh Amendment immunity when it passed 42 U.S.C. § 1983. *Wolfel,* 972 F.2d at 718. The Eleventh Amendment thus precludes all suits, whether for injunctive or monetary relief, against the state and its departments. *Cox v. Kentucky Dep't of Transp.,* 53 F.3d 146, 152 n.2 (6th Cir. 1995) (citing *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100–01 (1984)). Moreover, a suit against a state official in his or her official capacity is deemed a suit against the official's office. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, a suit against a state official in his or her official capacity is no different from a suit against the state itself, and is also barred by the Eleventh Amendment. *Id.*; see also *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299 (6th Cir. 1984). The Defendants named in Plaintiff's Amended Complaint are indisputably employees for an agency of the State of Ohio. To the extent that Plaintiff intends to pursue his claims against Defendants for their actions performed in official capacity, those claims are barred.

### III. Conclusion

In light of the foregoing, it is herein **RECOMMENDED** that Defendants' motion for summary judgment (Doc.15) be **GRANTED** and this case **CLOSED**.

<p style="text-align:right;"><u>s/Stephanie K. Bowman</u><br>
Stephanie K. Bowman<br>
United States Magistrate Judge</p>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| STEVEN-AZZIZ EL BEY, | Case No. 1:19-cv-693 |
| Plaintiff, | |
| vs. | Dlott, J.<br>Bowman, M.J. |
| THOMAS KEHR, *et al.*, | |
| Defendants. | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).