IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Steven Abdul-Azziz El Bey, | : | |
| | : | Case No. 1:19-cv-693 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Setting Aside the Report and |
| Thomas Kehr, *et al.*, | : | Recommendation |
| | : | |
| Defendants. | : | |

Plaintiff Steven-Azziz El Bey alleges that state prison officials have violated the Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by denying him the right to participate in congregate religious services with his faith group. On September 3, 2021, Magistrate Judge Stephanie K. Bowman issued a Report and Recommendation ("R&R") granting summary judgment to Defendants. (Doc. 22.) Plaintiff filed Objections to the R&R, and Defendants filed a Memorandum in Response opposing the Objections. (Docs. 29, 30.) For the reasons that follow, the Court will **SET ASIDE** the R&R and remand the case to the Magistrate Judge for further proceedings.

I.      BACKGROUND

A.      **Factual History**

Plaintiff currently is an inmate at the Allen Correctional Institution ("Allen CI"). Prior to June 2021, Plaintiff was incarcerated at the Warren Correctional Institution ("Warren CI"). Defendant Thomas Kehr is the Chaplain employed by Warren CI. Defendant Mike Davis is the Religious Services Administrator for the Ohio Department of Rehabilitation and Corrections ("ODRC").

1

1. **Plaintiff's Faith**

Plaintiff is a member of the Moorish Science Temple of America ("MSTA"). (Doc. 1 at PageID 2.)[1] He asserts that there were about two dozen MSTA members at Warren CI in 2017. (Doc. 18 at PageID 153.) Plaintiff describes MSTA as a "civic and religious organization founded by Noble Drew Ali" and "a major institution for uplifting fallen humanity." (Doc. 18 at PageID 152.) Defendants assert that the MSTA "believes that African Americans are descendants of the Moroccan Empire and Islamic by faith." (Doc. 15-1 at PageID 96.)

Plaintiff does not refer to himself as Muslim or a member of the Islamic faith. The primary exhibit which Plaintiff submits to explain his MSTA faith, an excerpt entitled "6. Moorish Documents, Letters, Statements—Moorish Leader's Historical Message to America[,]" speaks of the "Great God Allah" who is "All God, All Mercy and All Power. He is perfect and holy. All Wisdom, All Knowledge, and All Truth." (Doc. 18 at PageID 197.) Unfortunately, Plaintiff has not identified from what publication the exhibit is excerpted. Without a citation to specific evidence, Plaintiff asserts that Moorish services are different than Islamic services and

---

[1] Defendants argue in their Response to the Objections that Plaintiff has not submitted any evidence that can be considered on summary judgment because his Complaint is not properly verified and he has not submitted an affidavit or sworn declaration that complies with 28 U.S.C § 1746. Defendants are correct that Plaintiff has not satisfied the technical requirements of § 1746 that declarations be sworn and submitted under penalty of perjury. Plaintiff attested to the veracity of his Complaint, Responsive Memorandum in Opposition to summary judgment, and Objections by signing each as follows:

> Without Malice, Affiant / Creditor / Heir: Steven Abdul-Azziz El Bey Moorish American Sovereign National, Aboriginal, Indigenous, Divine Being – Manifested in human flesh, do hereby Declare by virtue of Divine Law; under the Zodiac Constitution (Natural Law); and upon my Fore-Mothers and Fore-Fathers that the above is the Truth, the Whole Truth and nothing but the Truth to the best of my knowledge and honorable intent.

(Doc. 1 at PageID 9; Doc. 18 at PageID 176; Doc. 29 at PageID 279.) He labels his briefs as "Affidavits of Fact." (Doc. 18 at PageID 151; Doc. 29 at PageID 258). For now, the Court will accept this as sufficient for summary judgment consistent with the *pro se* Plaintiff's obvious intention. *See, e.g., Powell v. Bartlett Med. Clinic & Wellness Ctr.*, No. 2:20-CV-02118, 2021 WL 243194, at *1 n.1 (S.D. Ohio Jan. 25, 2021) (accepting the truth of a *pro se* plaintiff's purported affidavit), *appeal filed* No. 21-3351 (6th Cir. Apr. 12, 2021); *Hancox v. Citimortgage, Citifinancial, Cmty. Mortg.*, No. 13-2629-STA-DKV, 2013 WL 12049113, at *2 n.9 (W.D. Tenn. Aug. 15, 2013) (excusing the "technical defect" of a *pro se* plaintiff's sworn statement).

are not led by an imam. (Doc. 18 at PageID 159; Doc. 29 at PageID 272.)

Defendants assert that the MSTA encourages the notion of sovereign citizenship—the belief that the laws of the United States do not apply to MSTA adherents—because MSTA adherents "proclaim their Moorish nationality and [are] given a nationality card to support their new citizenship." (Doc. 15-1 at PageID 96.) Defendants also assert that the MSTA expresses other "extreme ideals, such as W.D. Fard, a prominent leader, claiming to be the embodiment of Ali's spirit and stating that Europeans are the descendants of Satan." (*Id.*) Defendants cite to a document entitled "The Moorish Science Temple of America—AMEXEM" to support their understanding of the MSTA faith. The document does express sovereign citizen beliefs such as "the U.S.A. lawmakers have not jurisdiction over the free MOORS." (Doc. 15-6 at PageID 138.)[2] The document is of limited value, however. Defendants have not identified the source of the document. Moreover, they have submitted only the even-numbered pages of the document making it impossible to fully understand. The title page refers to the MSTA, but other pages refer to a Moorish religion or organization that might be separate from the MSTA. For example, page 22 lists the "IMASC Board of Elders" and page 20 shows the seal of "Indigenous Moorish-American Self-Determination Commission." (Doc. 15-6 at PageID 134–135.)

---

[2] Defendants go further in one of their briefs, making the unsupported assertion that the Southern Poverty Law Center considers the MSTA to be an "extremist group." (Doc. 19 at PageID 215.) In fact, the Southern Poverty Law Center states the following on their website:

> The origins of the Moorish sovereign citizen movement are difficult to ascertain and often misunderstood. According to law enforcement sources, Moorish sovereign citizens are closely affiliated with the Moorish Science Temple of America (MSTA) and trace their roots to the creation of the MSTA in 1913 and its founder, Noble Drew Ali (aka Timothy Drew). Some Moorish sovereigns are known to affiliate with the MSTA, but certainly **not all MSTA chapters are linked to sovereign citizens. In fact, the MSTA issued a statement in July 2011 condemning sovereign citizen practices and denying any association with radical or subversive Moorish sovereign groups.**

SPLC, *Moorish Sovereign Citizens*, https://www.splcenter.org/fighting-hate/extremist-files/group/moorish-sovereign-citizens (last visited 3/7/2022) (emphasis added).

Significantly, Plaintiff explicitly disputes that the MSTA supports sovereign citizen beliefs, and he denies that it follows the teachings of W.D. Fard. (Doc. 29 at PageID 262.) Plaintiff states that W.D. Fard is the founder of Nation of Islam, a separate and distinct group from the MSTA. (*Id.* at PageID 262–263.)[3] Moreover, Plaintiff's exhibit on the MSTA contains the following passage expressing admiration for the U.S. Constitution:

> Inspired by the lofty teachings of the Koran, we have it as the revealed word of God Allah. We shall foster the principles of its teachings among our members. This is our religious privilege as American citizens, under the laws of one of the greatest documents of all time—the American Constitution.

(Doc. 18 at PageID 207.)

### 2. Islamic Practices at Warren CI

The ODRC recognizes the MSTA as one of the six sects of Islam being practiced at Warren CI by 136 inmates. (Davis Aff., Doc. 15-1 at PageID 95.) An imam, who is an approved contractor with WCI, provided non-sectarian Islamic services at Warren CI for all six sects as of November 2020.[4]

Per ODRC Policy 72-REG-01—Institutional Religious Services, inmates are to be

---

[3] Plaintiff correctly points out in his Objections that a Wikipedia search yields posts stating that W.D. Fard once identified as a member of the MSTA, but that he became recognized as the founder of the Nation of Islam. Wikipedia, *Wallace Fard Muhammad*, https://en.wikipedia.org/wiki/Wallace_Fard_Muhammad#Moorish_Science_Temple_of_America (last viewed 3/7/2022). The Court does not point to the Wikipedia article for the truth of the matter asserted, but simply to state that there is at least a question of material fact whether it is fair to associate the teachings of W.D. Fard with the MSTA today.

[4] In a brief, Defendants identify the six sects as Hanafi, Sunni, MSTA, Nation of Islam, Nation of Gods & Earths, and Black Muslim. (Doc. 22 at PageID 222.) They cite Davis's Affidavit for that purported fact, but he does not identify any particular Islamic sects in his Affidavit. (Doc. 15.)

Prior to February 25, 1997, ODRC had an explicit policy on the Islamic faith. ODRC, Department Policies—Islam, 309-06 (effective date 5/8/1995). It identified MSTA as a "school of thought" within Islam. *Id.* at § IV.A. It also stated that ODRC would not provide "separate congregate activities for various Islamic sects." *Id.* at § IV.B.5.a.

On February 25, 1997, ODRC Policy Directive 309-01 replaced several existing policies including former 309-06. It did not directly identify major religions nor schools of thought within those religions, but it required that congregate services "appeal to the broadest possible range of persons who share beliefs in the basic tenants of the religion." ODRC, Religious Services, 309-01 at § VI.A.2 (effective date 2/25/1997).

afforded "access to religious services subject to legitimate departmental or institutional interests and concerns including security, safety, health, discipline, rehabilitation, order, and the limitations and allocation of resources[.]" (Doc. 15-2 at PageID 101.) The Policy states that "[c]ongregate activities such as worship services, prayer services, study classes, etc., must be led by, or under the immediate control of, a chaplain or approved religious services provider." (*Id.*) Inmates are not permitted to act as religious service providers under the policy. (*Id.* at PageID 98–99.) To become an approved religious services provider, an individual must submit the necessary paperwork and then typically be interviewed by the Chaplain and/or Deputy Warden of Special Services. (Doc. 15-1 at PageID 95; Doc. 15-2 at PageID 102.) The religious service provider must be in good standing within a congregation or credentialing body. (Doc. 15-1 at PageID 95.)

All religious service providers are advised that they should appeal to the broadest range of adherents in the faith group and "emphasize common, fundamental teachings of the faith." (*Id.* at PageID 102, 103; Doc. 15-1 at PageID 95.) In his Affidavit, Defendant Davis provided two reasons that sectarian services are not allowed:

> It is my professional opinion that ODRC does not have the capacity to provide individualized congregate services to all religions. Doing so would create a substantial burden on institutions and staff and the required space is simply not available. Furthermore, it is not feasible or economically possible for ODRC to employ a sufficient number of Muslim Imams for each subsect of Islam to preside at all ODRC institutions, and volunteers are not always available. The burden placed on ODRC institutions by providing these services to adherents to Islamic faith alone would be significant.
>
> Permitting individual sects congregate services would also create significant security concerns. Not only between those whom engage in congregate services and those without an available volunteer, but it would also amplify and encourage religious disputes that exist between those sects. Within the Islamic faith alone, there are significant religious disputes that ODRC has a vested interest in not encouraging with the potential to result in significant security concerns. Permitting congregate services poses a significant threat to the safety, security, and good order within institutions. There is also a significant concern that these

> services could be used to push a non-religious or political agenda or even for more detrimental purposes including criminal behavior and racism.

(Doc. 15-1 at PageID 96.)

In addition to attending congregate services, inmates are permitted to have personal visits from a minister of record pursuant to ODRC Policy 76-VIS-01. (Doc. 15–2 at PageID 104.) That policy requires the clergy to complete an application and send in a letter on letterhead providing proof of professional certification. A minister of record is allowed to provide sectarian teachings to an inmate on a one-on-one basis during his or her visits. (Doc. 15-1 at PageID 95.)

### 3. Plaintiff's Requests for MSTA Services

Plaintiff contends that between May 12, 2017 and an unspecified time after January 24, 2018, he requested congregate religious services at Warren CI for MSTA adherents. (Doc. 15-4 at PageID 116–123; Doc. 18 at PageID 177–196.) He pursued the matter first as a kite, then as a request for religious accommodation, and finally as a grievance. (Doc. 15-4 at PageID 116–123; Doc. 18 at PageID 177–196.) His requests for congregate MSTA services were denied at each level in part because Warren CI already provided non-sectarian Islamic services with a contracted Islamic imam. (Doc. 15-4 at PageID 116; Doc. 15-5 at PageID 124–132; Doc. 18 at 177–196.) For example, in response to the request for religious accommodation, Defendant Kehr bluntly stated that he had "already provided guidance on this matter" and that he recommended that Plaintiff "utilize Islamic services." (Doc. 15-4 at PageID 116.)

Defendants allowed Michael R. Doles-Bey to lead MSTA congregate services at Warren CI as a guest speaker one time on October 22, 2017. (Doc. 15-4 at PageID 112–114; Doc. 18 at PageID 189.) Defendants assert that Mr. Doles-Bey did not complete the application to become a volunteer religious services provider at the prison. (Doc. 18 at PageID 184, 186.) In fact, Defendant Davis averred that no one associated with the MSTA completed the steps necessary to

6

provide congregate religious services. (Doc. 15-1 at PageID 95–96.) Finally, Plaintiff did not avail himself of the opportunity to designate a minister of record to visit him at Warren CI and provide sectarian instruction consistent with his MSTA faith. (*Id.* at PageID 95.)

Though neither party addressed the significance of this fact in their briefs, Plaintiff was transferred to Allen CI in June 2021, after the Magistrate Judge issued the pending R&R.

**B.     Procedural Posture**

On August 18, 2019, Plaintiff initiated this action by filing a *pro se* Complaint against five individuals employed by Warren CI or the Ohio Department of Corrections for violation of religious rights under the Constitution and RLUIPA. (Doc. 1.) The Magistrate Judge conducted a *sua sponte* review of the Complaint to determine whether any portion of it should be dismissed as frivolous, malicious, or failing to state a claim for relief pursuant to the Prison Litigation Reform Act of 1995, 28 U.S.C §§ 1915(e)(2)(B) and 1915A(b). (Doc. 6.) She recommended dismissing all claims except for the First Amendment free exercise claim against Defendants Kehr and Davis in their individual capacities, the First Amendment free exercise claim against Defendant Davis in his official capacity for declaratory and injunctive relief, and the RLUIPA claim against Defendants Kehr and Davis for declaratory and injunctive relief. (*Id.* at PageID 36.) The Court issued an Order adopting the Magistrate Judge's recommendation. (Doc. 11 at PageID 57–58.)

Following a discovery period, on November 20, 2020, Defendants moved for summary judgment on the remaining claims. (Doc. 15.) Plaintiff opposed their motion. (Doc. 18.) The Magistrate Judge then issued the pending R&R in which she recommended that summary judgment be granted to Defendants. (Doc. 22.) Plaintiff filed Objections to the R&R, and Defendants filed a Response opposing the Objections. (Docs. 29, 30.)

7

## II. STANDARDS OF LAW

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

Magistrate judges are authorized to decide dispositive and non-dispositive matters pursuant to 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The district judge must conduct a de novo review of a magistrate judge's recommendation on a dispositive motion when an objection is filed. *Baker v. Peterson*, 67 F. App'x 308, 310 (6th Cir. 2003). "[T]he district court need not provide *de novo* review where the objections are frivolous, conclusive or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (per curiam) (cleaned up). Additionally, *de novo* review applies only to matters involving disputed facts. *Id.*

## III. ANALYSIS

### A. Legal Standards for the First Amendment and RLUIPA Claims

Plaintiff alleges that Defendants Kehr and Davis violated his right to free exercise of

8

religion by denying him the ability to participate in congregate MSTA religious services at Warren CI in violation of the First Amendment and the RLUIPA.

To establish a First Amendment free exercise of religion claim, a plaintiff must make a threshold showing: (1) that the "belief or practice asserted is religious in [his] own scheme of things"; (2) that the belief or practice is "sincerely held"; and (3) that the defendants' conduct infringes upon the belief or practice. *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987) (citations omitted). "[T]he constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). In the First Amendment context, "some rights are simply inconsistent with the status of a prisoner or with the legitimate penological objectives of the corrections system." *Id.* (internal quotation and citation omitted). A prison regulation that impinges on an inmate's constitutional rights is "valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

The Supreme Court in *Turner* provided a four-factor test for examining whether a prison regulation impermissibly violates an inmate's constitutional rights. "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (internal quotation omitted). The governmental interest must be "legitimate and neutral" and not based on "the content of the expression." *Id.* at 90. The determination of state prison authorities as to legitimate penological objectives and what regulations and practices further them is entitled to great deference. *Kent*, 821 F.2d at 1225 (citing *Block v. Rutherford,* 468 U.S. 576, 104 (1984)). The second *Turner* factor is whether "there are alternative means of exercising the right that remain open to prison inmates." 482 U.S. at 90. The third factor focuses on whether "the impact accommodation of the asserted

9

constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* The fourth factor requires a district court to determine if there are "ready alternatives" to the regulation because "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.* However, the prison need not adopt the "least restrictive alternative" in every situation. *Id.* at 90–91.

On the other hand, Section 3 of the RLUIPA provides in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)–(2). The Sixth Circuit calls for analyzing an RLUIPA claim as a three-act play:

> In Act One, the inmate must demonstrate that he seeks to exercise religion out of a "sincerely held religious belief." In Act Two, he must show that the government substantially burdened that religious exercise. In Act Three, the government must meet the daunting compelling-interest and least-restrictive-means test.

*Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019) (citations omitted).

The Court is not writing on a blank slate when it examines this issue about congregate religious services in prisons. The Supreme Court opined generally that congregate religious services need not be provided for every religious sect:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand. But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty.

*Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).

**B.     Insufficient Factual Record**

The legal standards for evaluating Plaintiff's First Amendment and RLUIPA claims are

10

clearly established and not disputed. How those standards apply to the facts of this case are disputed. The parties dispute whether the lack of MSTA congregate services substantially burdens Plaintiff's practice of religion, the extent to which holding MSTA services would create administrative burdens, and whether Defendants can prove that requiring MSTA adherents to worship in congregation with other Islamic inmates is based on legitimate penological interests or is the least restrictive means available to achieve their compelling interests. Unfortunately, these disputes cannot be resolved on the record before the Court.

To begin, neither party has addressed the legal significance of the fact that Plaintiff is no longer housed at Warren CI. Plaintiff requested that MSTA congregate services be held at Warren CI, not at Allen CI. There are no facts in evidence regarding for what religions congregate services are held at Allen CI. Likewise, the parties have not stated whether Plaintiff has sought to engage in congregate MSTA services at Allen CI. These facts likely are relevant insofar as Plaintiff seeks prospective injunctive relief.

Moreover, neither party has submitted sufficient evidence to support their factual assertions about the MSTA religious faith and its relationship with Islam. Defendants posit that MSTA is a sect of Islam that shares core, traditional Islamic beliefs. Although Plaintiff never explicitly states whether he considers himself to be Muslim or to share Islamic beliefs, the theme underlying his arguments is that MSTA is sufficiently different from Islam that it warrants its own congregate religious services even under the policies of the ODRC. Plaintiff states that "the very quintessence of the religion of Moorish Science is non-existent in what Defendant deems general Islamic services and there are no Imams in Moorish Science." (Doc. 29 at PageID 272.)

Case law evidences a lack of common understanding as to the relationship between MSTA and Islam. Several courts have referred to MSTA as an Islamic sect. *See*, *e.g.*, *Jackson-*

*Bey v. Hanslmaier*, 115 F.3d 1091, 1093 (2d Cir. 1997); *Johnson-Bey v. Lane*, 863 F.2d 1308, 1309 (7th Cir. 1988); *Abdullah v. Fard,* 974 F. Supp. 1112, 1114 (N.D. Ohio 1997). The Eighth Circuit Court of Appeals held that a Texas prison did not violate the Constitution when it denied Moorish Science Temple inmates the right to a Moorish Science Temple advisor separate from the general Islamic advisor. *Blair-Bey v. Nix*, 963 F.2d 162, 163 (8th Cir. 1992). It based that decision, however, on specific factfinding by the district court, including that the Islamic advisor serving at the prison understood "the nuances of the MST sect." *Id.* at 164.

Other courts have acknowledged distinctions between MSTA and the Islamic faith. In a Seventh Circuit case, then Chief Judge Posner made the following observation:

> The prison classifies the Moors [adherents of MSTA] as Muslims, but they are pretty *sui generis*. They have a sacred book that they call the "Koran," but it is not the Islamic Koran, and while they respect Mohammed, along with Jesus and others, as prophets, they give primacy to their own prophet, Drew Ali. They are permitted to and do conduct their own religious services at Menard [prison].

*Mack v. O'Leary*, 80 F.3d 1175, 1178 (7th Cir. 1996).[5] Later, a district court in the Seventh Circuit surveyed the then-existing case law and commented that "even if there is wide agreement that the MSTA is related to Islam, what remains unclear is the extent to which the MSTA follows Islamic tenets." *Saunders-El v. Tsoulos*, 1 F. Supp. 2d 845, 849 (N.D. Ill. 1998). In *Saunders-El*, the Illinois prison treated MSTA as a separate religion with separate traditions from Islam, and the court found that an MSTA inmate's right to celebrate Ramadan was not clearly established. *Id.* at 847–849. Similarly, as of 2017, a Michigan prison provided MSTA services apart from the general Islamic services. *See Alexander v. Mich.*, No. 1:13-CV-1372, 2017 WL 4334341, at *6 (W.D. Mich. Sept. 28, 2017). In fact, the issue in *Alexander* was whether a

---

[5] *Mack* had a convoluted procedural history after this decision. The Supreme Court granted certiorari and vacated the Seventh Circuit judgment. 522 U.S. 801 (1997). Ultimately, the Seventh Circuit reached the same legal conclusion on the MSTA portion of the case and did not make any contrary factual findings. Nos. 95-1331, 94-1849, 1998 WL 416151, at *2 (7th Cir. June 17, 1998).

12

splinter Moorish group of inmates deserved religious services separate from the MSTA services. *Id.*

In this case, neither party has offered sufficient facts, properly supported with evidence, to shed light on the relationship between the MSTA and Islam. Plaintiff's assertions are conclusory and do not address all the relevant legal issues. For example, from what source is the exhibit entitled "6. Moorish Documents, Letters, and Statements" taken? (Doc. 18 at PageID 197–209.) What specific differences are there, if any, between MSTA and other Islamic faiths? In what way were the Islamic congregate services offered at Warren CI insufficient or incompatible with his MSTA beliefs? What proof does he have that an MSTA volunteer completed paperwork to serve as a religious services provider or a minister of record? The Court suggests that Plaintiff obtain a sworn statement from a potential MSTA religious services provider to both explain MSTA beliefs and to explain the steps he took to volunteer to lead services at Warren CI. On that point, Plaintiff is advised that any sworn statement, including Plaintiff's own statements of fact, must be signed, dated, and explicitly made "under penalty of perjury" in accord with 28 U.S.C § 1746. Finally, Plaintiff has not addressed whether he has tried to attend or been able to attend MSTA congregate religious services at Allen CI.

Likewise, the Court cannot determine from what sources or authority Defendants base their understanding of the tenants of the MSTA. The primary exhibit relied upon by Defendants is from an unknown source, has missing pages, and might conflate the MSTA with a different Moorish sect. Unlike in the *Blair-Bey* case, Defendants here have not produced an affidavit or sworn statement from the prison-contracted imam to explain his knowledge about MSTA beliefs and whether those beliefs are consistent with general Islamic teachings.

Defendants also have not provided specific facts about the administrative burdens created

13

by holding an MSTA congregate service. Do Defendants have proof that MSTA inmates at Warren CI or Allen CI have sovereign citizen beliefs or pose a special security risk? How many MSTA members were there at Warren CI and/or how many are there at Allen CI? How does the number of MSTA inmates compare to the number of followers of other religions, Islamic or non-Islamic, which are permitted to hold congregate religious services at each prison? Is a separate security guard or prison official required to be present if an MSTA congregate service is held? Have members of other Islamic sects requested separate, sectarian congregation services for their sects? The Court concludes that it would be inappropriate to grant or deny summary judgment at this time without further development of the factual record.

### IV. CONCLUSION

For these reasons, the Court **SETS ASIDE** Report and Recommendation (Doc. 22). The Magistrate Judge is directed to permit the parties a reasonable period of time to obtain discovery, if needed, and submit additional evidence in accord with Federal Rule of Civil Procedure 56(e)(1). The Court leaves it to the Magistrate Judge's discretion to determine what additional briefing is necessary.

**IT IS SO ORDERED.**

                                                BY THE COURT:

                                                S/Susan J. Dlott
                                                Susan J. Dlott
                                                United States District Judge