**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

STEVEN-AZZIZ EL BEY,                                  Case No. 1:19-cv-693

     Plaintiff,

                                   Dlott, J.

     vs.                                                Bowman, M.J.

THOMAS KEHR, *et al.,*

     Defendants.

**AMENDED REPORT AND RECOMMENDATION**

Pursuant to local practice, this prisoner civil rights case has been referred to the undersigned magistrate judge. On September 3, 2021, the undersigned filed a Report and Recommendation ("R&R") that recommended that Defendants' motion for summary judgment be granted. (Doc. 22). However, the Court set aside that R&R and remanded to the undersigned for further development of the record. Based upon the supplemented record, the undersigned again recommends that summary judgment be granted.

    **I.**      **Procedural Background**

Plaintiff, who proceeds pro se, filed a complaint against multiple defendants while he was incarcerated at the Warren Correctional Institution ("WCI"). Included in the complaint are allegations that two prison officials denied his requests to engage in group worship with other members of Plaintiff's religion, the Moorish Science Temple of America ("MSTA"). Defendant Thomas Kehr is the Chaplain at WCI, whereas Defendant Mike Davis is the Religious Services Administrator for the Ohio Department of Rehabilitation and Corrections ("ODRC"). After initial screening, the undersigned filed a Report and Recommendation that concluded:

> [T]he complaint may proceed … against defendants Kehr and Davis, in their individual capacities, under the free exercise clause of the First Amendment and, to the extent the complaint seeks declaratory and injunctive relief, under RLUIPA. To the extent that plaintiff seeks declaratory and injunctive relief, plaintiff's First Amendment free exercise and RLUIPA claims may also proceed at this juncture against defendant Davis in his official capacity.

(Doc. 6 at 7, PageID 35, adopted at Doc. 11).

After discovery, Defendants moved for summary judgment and the undersigned recommended that motion be granted. (Docs. 15, 22). When no timely objections were filed, the Court adopted that R&R and entered final judgment on September 20, 2021. (Docs. 23, 24).

Plaintiff did not appeal. Instead, Plaintiff filed a "writ to amend judgment" on November 1, 2021, in which he alleged he had been unable to file objections due to his transfer from WCI to the Allen Oakwood Correctional Institution ("AOCI") three months *before* the R&R was filed. (*See* Doc. 25). Prior to filing his "writ," Plaintiff failed to notify the Court of his change of address.  Although many courts hold that a pro se litigant's failure to keep the court informed of his current address amounts to a failure to prosecute,[1] the Court exercised its discretion in this case to vacate the adoption of the R&R and to reopen the objection period.[2] (Doc. 27).

---

[1]Plaintiff is forewarned that any future failure to notify the Court of a change in address may be so treated as a failure to prosecute. *See Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991) (holding that a pro se litigant has an affirmative duty to diligently pursue the prosecution of his cause of action); *Barber v. Runyon*, No. 93–6318, 1994 WL 163765, at *1 (6th Cir. May 2, 1994) (holding that a pro se litigant has a duty to supply the court with notice of changes in his address); *Theede v. U.S. Dep't. of Labor*, 172 F.3d 1262, 1265 (10th Cir. 1999) (holding that failure to object to a magistrate judge's R&R because of party's failure to bring to the court's attention a change in address constitutes failure to object in a timely manner, and that because the R&R was mailed to the last known address, it was properly served and party waived right to appellate review); *El Bey v. Wisecup*, Case No. 1:21-cv-678 (S.D. Ohio, July 20, 2022) (rejecting argument that Plaintiff had not timely received copy of the R&R, holding that Plaintiff had failed to prosecute where R&R mailed to Plaintiff at his last known address was returned as not deliverable).

[2]The vacatur of the Order adopting the R&R (Doc. 23) is presumed also to have vacated the Entry of Judgment. Although Plaintiff's "writ" admits to actual receipt of the September 2021 R&R on October 6, 2021, the Court expanded the time for filing objections to January 31, 2022.

Under the "mailbox rule," Plaintiff timely filed objections on February 3, 2022.[3] (Doc. 29). Reconsidering the R&R in light of those objections, the Court concluded that the record was insufficiently developed to warrant summary judgment. (Doc. 31). The Court cited factual disputes concerning "whether the lack of MSTA congregate services substantially burdens Plaintiff's practice of religion, the extent to which holding MSTA services would create administrative burdens, and whether Defendants can prove that requiring MSTA adherents to worship in congregation with other Islamic inmates is based on legitimate penological interests or is the least restrictive means available to achieve their compelling interests." (*Id*. at 11, PageID 296). The Court further noted that neither party had addressed the significance of Plaintiff's transfer to AOCI.[4] (*Id*.)  In finding the record insufficiently developed concerning the potential burden on Plaintiff's religious practice, the Court focused on the parties' "factual assertions about the MSTA religious faith and its relationship with Islam." (*See* Doc. 31 at 13-14, PageID 298-299). The Court remanded to the undersigned for further proceedings.

At the Court's suggestion, the undersigned reopened discovery and permitted the filing of supplemental briefs regarding the still-pending motion for summary judgment. Informed by that supplemental briefing, the undersigned again recommends that Defendants' motion be GRANTED.

---

[3]Plaintiff delivered his objections to prison authorities within the deadline, as evidenced by the January 31, 2022 postal stamp on the envelope in which the objections were mailed. *See generally United States v. Smotherman*, 838 F.3d 736, 737 (6th Cir. 2016) (holding a prisoner's notice of appeal to be timely when delivered with prepaid postage to prison authorities for mailing to the clerk of court).

[4]The Court expressed curiosity about "what religious congregate services are held at [AOCI]" and whether Plaintiff has sought to engage in congregate MSTA services at AOCI. (Doc. 31 at 11, 14). For the reasons explained below, the issues in this lawsuit should be limited to WCI.

## II.     Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is proper, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). It is the moving party that has the burden of showing an absence of evidence to support the nonmoving party's case, see *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986), and the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986).

After a moving party has carried its initial burden of production, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87. He must "designate specific facts in affidavits, depositions, interrogatories, or other factual material" from which a reasonable jury could find in his favor. *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F.Supp.2d 846, 849 (S.D. Ohio 2011). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). There must be more than "some metaphysical doubt as to the material facts.'" *EEOC v. Ford Motor Corp.*, 782 F.3d 753, 770 (6th Cir. 2015) (en banc).

The Court's prior Order found the factual record to be insufficiently developed under Rule 56. The Court permitted both parties to supplement the record, carefully

4

explaining to Plaintiff his obligation to present probative countervailing evidence should Defendants carry their initial Rule 56 burden of production. Before re-addressing the merits of Defendants' motion, the undersigned first: (1) clarifies the scope of Plaintiff's claims; and (2) explains why Plaintiff's supplemental memorandum fails to satisfy Rule 56(c) and (e).

### III. The Scope of Plaintiff's Claims at WCI

In clarifying the scope of Plaintiff's claims, the undersigned acknowledges that the Court's May 5, 2022 Order raised the issue of whether religious practices at AOCI might also be considered; the parties have attempted to address that issue in their supplemental memoranda. However, the parties only provided minimal information in the supplemental memoranda on this issue.

Pro se litigants are not exempt from the requirements of the Federal Rules of Civil Procedure. In the context of prisoner litigation, the scope of a pro se litigant's claims is typically developed upon initial screening or upon review of a motion to dismiss. On initial screening here, Plaintiff's complaint was liberally construed and permitted to proceed to discovery on only two § 1983 and RLUIPA claims against two Defendants based solely upon their denial of Plaintiff's request for religious accommodations at WCI. Discovery on Plaintiff's WCI claims concluded more than two years ago and the Defendants thereafter moved for summary judgment. After the Court set aside the initial grant of summary judgment for further development of the record under Rule 56, the Court reopened discovery. However, at no time did Plaintiff ever seek to amend his complaint.

The Sixth Circuit has held that courts should not "abrogate basic pleading essentials in *pro se* suits." *Wells v. Brown,* 891 F.2d 591, 594 (6th Cir. 1989). A court's

"duty to be 'less stringent' with pro se complaints does not require us to conjure up unpled allegations." *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979) (citation omitted); *see also Brown v. Matauszak,* 415 Fed. Appx. 608, 613 (6th Cir. 2011) ("[A] court cannot create a claim which [a plaintiff] has not spelled out in his pleading,") (internal quotation marks omitted); *Payne v. Sec'y of Treas.,* 73 Fed. Appx. 836, 837 (6th Cir. 2003) (affirming sua sponte dismissal of complaint, stating, "[n]either this court nor the district court is required to create Payne's claim for her"); *cf. Pliler v. Ford,* 542 U.S. 225, 231, 124 S.Ct. 2441 (2004) ("District judges have no obligation to act as counsel or paralegal to pro se litigants."); *Young Bok Song v. Gipson,* 423 Fed. Appx. 506, 510 (6th Cir. 2011) ("[W]e decline to affirmatively require courts to ferret out the strongest cause of action on behalf of pro se litigants" because it would be "overly burdensome" and "would transform the courts from neutral arbiters of disputes into advocates for a particular party.").

The Prison Litigation Reform Act ("PLRA") contains a mandatory exhaustion requirement. *See* 42 U.S.C. § 1997e(a). On its face, Plaintiff's complaint is limited to allegations concerning his religious exercise at WCI, with no allegations that relate to AOCI. Construing Plaintiff's original complaint to include – at the summary judgment phase – unpled new claims concerning AOCI would circumvent Defendants' opportunity to raise any reasonable affirmative defenses, including but not limited to the defense of administrative exhaustion.[5] *See generally, Harbin v. South Carolina Dept. of Corrections*,

---

[5]Defendants do not dispute that Plaintiff fully exhausted the administrative grievance process *at WCI*, (Doc. 1 at ¶38, PageID 6; Doc. 15-3, 15-4). However, Davis attests that Plaintiff has never made a request for religious accommodation at AOCI since being transferred there in June 2021. (Doc. 41-1 at ¶ 28). Although Plaintiff's brief is not evidence, he newly alleges in his supplemental memorandum that he requested group MSTA services at AOCI in "August of 2022" and has not received a response. (Doc. 42 at 17, PageID 576). There are no allegations regarding the completion of the 3-step grievance process. *Contrast Byrd v. Haas*, 17 F.4th 692, 698 (6th Cir. 2021) (holding that multi-year failure to acknowledge requests amounted to denial).

2014 WL 4955200, at *13 (D.S.C. 2014) (granting summary judgment on new claim that had not been exhausted prior to filing amended complaint). In addition, First Amendment and RLUIPA claims in the prison context require close scrutiny of specific institutional facts. Religious items or practices that may raise safety concerns at a high-security institution may pose little concern at a low-security institution. Space and staffing also may differ. Based upon the limited and fully exhausted claims that this Court permitted to proceed after initial screening, the instant complaint is not reasonably construed to state *any* claim against either Defendant following Plaintiff's transfer to AOCI on June 3, 2021. In short, Plaintiff's allegations and corresponding claims should be limited to his requests for religious accommodations at WCI beginning in May 2017.

In the interest of clarity, the undersigned further defines the religious exercise at issue. Plaintiff alleges that he requested MSTA "religious services" at WCI, such as congregate services, prayer services, meetings and study classes. (Complaint, Doc. 1 at ¶10, PageID 2). He specifically seeks "*some type of service i.e.* congregate services, prayer services, meetings, study classes either [led] by or under the immediate control of a chaplain or religious service provider." (*Id*. at ¶ 12, PageID 3, emphasis added; *see also id*. at ¶B1, PageID 7).[6] In short, it is clear that Plaintiff's request is for MSTA-specific "religious services" – a request that both Defendants and this Court have reasonably construed to mean sectarian congregate services. (*See* Doc. 1 at ¶31, PageID 5; Doc. 31 at 1, 9, characterizing claim as the denial of "the right to participate in congregate religious services with his [MSTA] faith group.").

---

[6]Plaintiff does not define "religious services" beyond broad categorical descriptors. Whereas the meaning of "study classes" is self-explanatory, the difference between "congregate services" "worship services" and "prayer service" is not. But all of the identified religious practices are communal in nature.

## IV.    Plaintiff's Failure to Cite to Evidence Under Rule 56

Plaintiff's supplemental memorandum was filed beyond the October 8 deadline and was unaccompanied by *any* evidentiary exhibits, despite the fact that the Court's May 5, 2022 Order clearly explained that arguments alone were insufficient under Rule 56.[7] Rule 56(c) provides that a non-moving party must "cit[e] to particular parts of materials in the record" to demonstrate the existence of a genuine dispute of material fact, or otherwise "show[ ] that the materials cited" by the moving party do not demonstrate that no disputed issue of material fact exists. In other words, the non-moving party must "designate specific facts in affidavits, depositions, interrogatories, or other factual material" from which a reasonable jury could find in his favor. *Maston.*, 832 F.Supp.2d at 849 (S.D. Ohio 2011); *see also* Rule 56(c)(4); S.D. Ohio Civ. R. 7 .2(e) ("Evidence shall be presented, in support of or in opposition to any motion, using affidavits, declarations pursuant to 28 U.S.C. § 1746, deposition excerpts, admissions, verified interrogatory answers, and other documentary or electronic exhibits.").

Following the heading "SUPPLEMENTAL BRIEF Relating to Defendants' motion for summary judgment," the title page of Plaintiff's brief includes a somewhat cryptic subheading: "Affidavit of Fact." (Doc. 42 at 1, PageID 560). Plaintiff's additional reference to 28 U. S. C. § 1746 at the conclusion of the 19-page brief suggests that Plaintiff may be under the mistaken impression that he can convert his entire "BRIEF" into probative

---

[7]In its Order, the Court questioned whether Plaintiff had any "proof …that an MSTA volunteer completed paperwork to serve as a religious services provider or a minister of record?" (Doc. 31 at 13). The Court suggested "that Plaintiff obtain a sworn statement from a potential MSTA religious services provider to both explain MSTA beliefs and to explain the steps he took to volunteer to lead services at Warren CI," and advised Plaintiff that "any sworn statement, including Plaintiff's own statements of fact, must be signed, dated, and explicitly made 'under penalty of perjury' in accord with 28 U.S.C § 1746." (*Id.*)

evidence.[8] But even if the Court considers his supplemental brief to be timely filed,[9] his cursory references are insufficient to alter the essence of his legal memorandum.[10]

First, the brief is not an "Affidavit" because it is not notarized. In *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002), the Sixth Circuit succinctly explained the difference between a formally notarized "Affidavit" and an unsworn "Declaration" made under penalty of perjury:

> While an "affidavit" is required to be sworn to by the affiant in front of an "officer authorized to administer oaths," *see* Black's Law Dictionary 54 (5th ed.1979), 28 U.S.C. § 1746 allows for "unsworn declarations under penalty of perjury" to support any matter that legally requires an affidavit to support it. According to § 1746, the declaration must comport to the following form: "I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746(2).

*Id.*

The brief also is not an unsworn Declaration that comports with 28 U.S.C. § 1746 and Rule 56(c)(4). Merely labeling a 20-page memorandum as a qualifying "Declaration" does not make it so. Fed. R. Civ. P. 56(c)(4) states that "[a]n affidavit or declaration used to support or oppose a motion <u>must be made on personal knowledge</u>, set out <u>facts that would be admissible in evidence</u>, and show that the affiant or declarant is competent to

---

[8]On the same page as his certificate of service, Plaintiff includes the following verbiage: "**Under Penalty of Perjury in accord with 28 U.S.C. § 1746** Without Malice. Affiant / Creditor / Heir: Steven Abdul-Azziz El Bey Moorish American Sovereign National, Aboriginal, Indigenous, Divine Being - Manifested in human flesh, do hereby Declare by virtue of Divine Law; under the Zodiac Constitution (Natural Law); and upon my Fore-Mothers and Fore-Fathers that the above is the Truth, the Whole Truth and nothing but the Truth to the best of my knowledge and honorable intent." (Doc. 42 at 19, PageID 578 (emphasis original)).

[9]The envelope bears the postage date of October 12, 2022, and a certificate of service that states that Plaintiff delivered it "to the staff member in charge of electronic filing or deposited this document in the appropriate outgoing legal mailbox" on October 7. (Doc. 42 at 19-20, PageID 578-79). But for the mailbox rule to apply, the certificate of service itself must be made under penalty of perjury and state that the inmate has included the necessary postage. *See Williams v. Rewerts*, 2019 WL 1620808, at *1 (6th Cir. Jan 10, 2019) (citing *Price v. Philpot*, 420 F.3d 1158, 1166-67 (10th Cir. 2005)); *Kline v. Michigan,* No. 1:06-cv-776, 2007 WL 295020, at *1 (W.D.Mich. Jan.25, 2007).

[10]This Court previously noted that Plaintiff has twice before (mis)labeled entire briefs as "Affidavits of Fact." (Doc. 31 at 2, n.1, PageID 287).

testify on the matters stated." *Id.* (emphasis added). Plaintiff's brief is replete with hearsay and piecemeal quotations[11] and contains few (if any) statements of fact made on the basis of personal knowledge on which Plaintiff is competent to testify. Instead, it consists almost entirely of recitations of beliefs comingled with argument.[12] The undersigned does not doubt the sincerity of Plaintiff's beliefs. But "[b]elief, no matter how sincere, is not equivalent to knowledge." *Townsend v. Rhodes*, Case No. 14-10411, 2015 WL 5675749, at *6 (E.D. Mich. Sept. 28, 2015) (affirming summary judgment and magistrate judge's failure to consider inmate affidavit not made on basis of personal knowledge).

When a so-called "affidavit" strays from admissible facts, the Sixth Circuit has held that a trial court has discretion to strike the affidavit in whole or in part, depending upon the ease with which it can "distinguish between knowledge and belief for each of the affidavit's averments." *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015). Here, the burden of trying to ferret out statements of fact from argument would be extraordinary. Therefore, the undersigned rejects the Supplemental Brief insofar as it purports to contain any probative evidence. Rather, the undersigned limits its consideration to the argument it presents. *See generally*, *Balimunkwe v. Bank of America, N.A.*, Case No. 1: 14-cv-327, 2016 WL 75084, at *13 (S.D. Ohio, Jan 6, 2016) (rejecting plaintiff's affidavits as "replete with inadmissible legal arguments, hearsay, speculation, and statements that are not within plaintiff's personal knowledge"); *Brautigam v. Damon*, Case No. 1:11-cv-551, 2015 WL 11018199, at *14 (S.D. Ohio Nov. 17, 2015) (disregarding "affidavit" that "largely

---

[11]*See, e.g., Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007) (disregarding hearsay in affidavit).

[12]The brief begins with extensive discussion of Plaintiff's beliefs about the origins of words used to describe racial or ethnic groups, and about the history of North America. (*See* Doc. 42 at 2-10; *see also id.* at 4, PageID 563) ("Moors (Africans) were settled and trading with in the Americas long before the voyage of Christopher Columbus"). He then segues into a discussion of why Plaintiff believes that "Moors" were historically distinct from a Sunni Muslim group, before turning at last to an explanation of why Plaintiff believes that his present practice of MSTA is distinct from orthodox Islam.

rehash[es] plaintiff's memorandum" and consists of "inadmissible argument, speculation, and hearsay" with "few 'facts' based on plaintiff's first-hand knowledge."); *Atkins v. Christiansen*, Case No. 1:08-cv-972, 2011 WL 4527364, at *5 (W.D. Mich. June 6, 2011) (Despite "cryptic" reference to 28 U.S.C. § 1746, memorandum contained a mixture of "legal arguments, opinions and factual statements" that were "conclusory or not relevant" and insufficient to preclude summary judgment).

## V. Findings of Fact

When a party fails to properly address another party's assertion of fact, a court may consider the fact undisputed. *See* Fed. R. Civ. P. 56(e)(2). Based upon the record presented, the undersigned finds the following facts undisputed:

1. At the time he filed this lawsuit on August 1, 2019 until around June 3, 2021, Plaintiff was incarcerated at WCI, a close security male prison. Defendant Kehr was the chaplain assigned to WCI. Defendant Davis is the Religious Services Administrator for all ODRC institutions including WCI.

2. A "catchment" is a term used by ODRC to categorize similar religions or faiths. During the time that Plaintiff was housed at WCI, ODRC recognized nine generic religious catchments: Protestants; Jehovah Witness Religious Services; Jewish Religious Services; Buddhist Religious Services; Wiccan Religious Policy; Asatru Religious Policy; Roman Catholic-Orthodox Religious Services; Muslim Religious Practices; and Native American Religious Policy. ODRC has policies for each catchment that provide guidance for practices within each catchment. Guidance for Muslim Religious Practices is contained in Policy 72-REG-12. (Doc. 41-2 at PageID 435-438).

3.  While at WCI, Plaintiff identified himself as a member of the Moorish Science Temple of America ("MSTA"). (*See* Doc. 1, at PageID 2).

4.  ODRC has classified MSTA under the umbrella catchment of Muslim Religious Practices (hereinafter the "Muslim catchment") based upon the self-identification of the MSTA religion as a form of Islam, the understanding of the ODRC Religious Advisor and contract religious providers that MSTA shares central beliefs with Islam, scholarly articles and similar sources that describe MSTA's relationship to Islam, and the same classification by other penal institutions such as the Bureau of Prisons. (*See generally*, Doc. 41-1 at ¶¶ 16, 18-21 (Davis Supp. Decl.); 41-2 at 1, PageID 347 (MSTA Constitution); *Id*. at PageID 178-179 (MSTA missionary pamphlet); *Id*. at PageID 453-489 (scholarly articles); *Id*. at 180-188 (BOP materials); Doc. 41-4 at ¶ 12, PageID 551 (Engle Decl.); Doc. 41-6 at ¶ 6, PageID 554 (Abdul-Rahim Decl.); Doc. 41-7 at ¶ 7, PageID  556 (Hansbhai Decl.). In addition to MSTA, recognized sects under the Muslim catchment include Islam (formerly Black-Muslim), Islam (no specified denomination), Shiite, Hanafi, Nation of Islam, and Sunni denominations.  (See Doc. 41-1 at ¶21, PageID 345.).

5.  Plaintiff submitted a request for MSTA sectarian congregate services at WCI. In his administrative request, Plaintiff identifies himself as: "Moslem." (Doc. 15-4 at 9, PageID 120);

6.  Plaintiff's requests for sectarian services were denied in part because non-sectarian congregate services were already being provided for the Muslim catchment by a religious service provider. (*See* Doc. 15-3, PageID 116, stating that MSTA "falls under

the umbrella of Islam and receives services from the Imam; having their own leader or worship is not needed.").

7. ODRC houses approximately 43,134 incarcerated individuals at all of its institutions. Of those, approximately 0.46% of the inmate population identify as adherents of MSTA. (Doc. 41-2 at 98, PageID 444).

8. While Plaintiff was at WCI, there were approximately 136 individuals who self-identified as followers of one of the religions classified within the Muslim catchment. As of November 2, 2017, 9 individuals at WCI identified specifically as followers of MSTA. (Doc. 41-2 at 103, PageID 449, Kehr email (Nov. 2, 2017)).[13]

9. ODRC Policy 72-REG-01 requires the selection of contract religious providers who can "ensure coverage for the largest religious catchments in the facility." (Doc. 41-2 at 25, PageID 371; *see also* Doc. 41-1 at ¶13, PageID 344). Although the hiring and supervision of the contract religious providers falls to the assigned deputy warden in consultation with the ODRC religious services administrator, he/she may designate the institutional Chaplain as the monitor and informal point of contact. (Doc. 41-2 at 25, PageID 371).

10. Congregate services of any faith require either the supervision of the Chaplain or an outside volunteer (not an inmate) who has been properly vetted and passed all security clearances. (72-REG-01, Doc. 41-2 at 22, 25, PageID 368, 371). To become an approved religious services provider, an individual must submit the necessary paperwork and then typically be interviewed by the Chaplain and/or Deputy Warden of Special Services. (Doc. 15-1, PageID 95; Doc. 15-2, PageID 102). The religious

---

[13]Defendants refer to a second Kehr email that reflects an increase in MSTA membership at WCI to 18 in September 23, 2018, but the cited exhibit is not included in the record before this Court.

service provider must be in good standing within a congregation or credentialing body. (Doc. 15-1, PageID 95).

11. Imam Yahya Hansbhai serves as the Muslim catchment contract religious provider at WCI. Consistent with ODRC policy, he is required "to appeal to the broadest range of adherents in the Muslim faith group by teaching the central tenets of the faith." (Doc. 41-7, Hansbhai Decl. at ¶ 5, PageID 556). Imam Hansbhai is "familiar with the Moorish Science Temple and their practices" through reading and speaking with, and working directly with, MSTA adherents. (*Id.* at ¶¶ 4, 7, PageID 556-557).

12. Pursuant to 72-Reg-12, WCI provided two weekly "congregate services or activities" for the Muslim catchment: "Jumah" defined as "congregational prayer on Fridays, and "Taleem" defined as religious education or studies. (Doc. 41-2 at 90, PageID 436). However, Plaintiff did not attend any Muslim catchment congregate services at WCI, nor did Plaintiff ever speak with the Muslim catchment Imam. (Doc. 41-7, Hansbhai Decl. at ¶¶9-10, PageID 557; Doc. 15-4 at 5, PageID 116).

13. An inmate may make a request for the approval of additional congregate services. However, pursuant to ODRC Policy 72-Reg-02, ¶ H(2), a request for additional congregate services must be made by at least five (5) documented members of that group not already receiving such services, and the request must be referred to the Religious Services Administrator for final decision.  (Doc. 41-2 at 38, PageID 384).

14. Religious volunteers, subject to ODRC Policy 71-REG-01, and with the proper religious and security oversight, may provide additional religious services. Religious volunteers also must appeal to "the broadest possible range of persons in the faith group," and avoid "[s]ectarian distinctions …by appealing… to the common,

fundamental teachings of the faith." (Doc. 41-2 at 26, PageID 372). In addition, volunteers are advised to refer "[q]uestions that may generate controversy" to the Institutional Chaplain. (*Id.*)

15. After the denial of his request for MSTA sectarian services, Plaintiff identified a community volunteer alleged to be willing to serve at WCI. The volunteer, Michael R. Doles-Bey, led an MSTA meeting at WCI on October 22, 2017,[14] but was approved as a guest volunteer on that date only. (Doc. 15-4 at PageID 112-114; Doc. 41-2 at 11, PageID 357 (defining "guest volunteer")).

16. A total of 17 inmates attended the October 2017 meeting, following which Plaintiff alleges that Mr. Doles-Bey offered to provide additional "prayer services, congregate services etc." in the future. (Doc. 1 at ¶¶ 20-21; Doc. 41-2 at 103, PageID 449 (Kehr email)). However, neither Mr. Doles-Bey nor anyone else affiliated with MSTA completed the requisite paperwork to become a volunteer religious services provider at WCI. (Doc. 15-1 at ¶ 9, PageID 95-96).

17. Inmates may designate and receive visits from their clergy of record in order to receive sectarian religious instruction on a one-by-one basis as provided in ODRC Policy 76-VIS-01 (Doc. 41-3; Doc. 41-1 at ¶ 26, PageID 345). Defendant Kehr informed Plaintiff that the volunteer could be a "minister of record" if he completed the requisite paperwork. (Doc. 15-4, PageID 116). No completed paperwork was returned by Mr. Doles-Bey and Plaintiff did not designate any other clergy of record to visit him at WCI. (*Id.*; Doc. 15-1 at ¶ 8, PageID 95).

---

[14]Plaintiff's complaint identifies the date as November 22, 2017 but Defendants have provided evidence that the date was October 22, 2017. (Doc. 41-2 at 103, PageID 449).

18. In addition to participating in non-sectarian services and/or designating clergy of record, inmates may read and maintain religious materials in their prison cells, and perform individual religious exercises. (Doc.41-1 at ¶ 11, PageID 343).

## VI.    Analysis

Plaintiff seeks monetary and injunctive relief against both Defendants in their individual capacities, as well as declaratory and injunctive relief against Defendant Davis in his official capacity.(Docs. 6, 11). Plaintiff's claims are twofold: that Defendants have violated his free exercise rights under the First Amendment and that Defendants have violated the Religious Land Use and Institutionalized Persons Act (RLUIPA). As discussed below, significant distinctions exist between the First Amendment and RLUIPA claims, but Defendants are entitled to judgment as a matter of law on both claims.

### A.  All RLUIPA and § 1983 Claims for Injunctive Relief at WCI are Moot

Plaintiff was permitted to proceed on claims for declaratory and injunctive relief under both RLUIPA[15] and 42 U.S.C. § 1983 based upon Defendant Kehr's denial of religious accommodations to Plaintiff at WCI and Davis's affirmance of that decision. Specifically, Plaintiff seeks an order permitting sectarian MSTA "religious services" in designated building space at WCI. (Doc. 1 at PageID 7-8). Since all prospective relief sought in the complaint is directed to MSTA congregate services **at WCI** without reference to any other institution, Plaintiff's transfer to AOCI on June 3, 2021 renders all such claims moot. *See generally*, *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 510 n.1 (6th Cir. 2001)) (holding that injunctive and declaratory relief are moot when a defendant is no longer incarcerated at the facility that is the subject of his complaint); *Colvin v. Caruso*, 605 F.3d

---

[15]No cause of action for monetary damages exists under RLUIPA. *See  Hendricks v. Aramark, Inc.*, No. 2:14-cv-2015, 2015 WL 1809361, at *4 (S.D. Ohio Apr. 21, 2015) (citing cases).

272, 289 (6th Cir. 2010) (inmate's RLUIPA claims and other claims for injunctive relief were moot after his transfer to a different facility); *Berryman v. Granholm*, 343 Fed. Appx. 1, at *3 (6th Cir. 2009) (same); *Pleasant-Bey v. Shelby Cnty.,* Case No. 18-6063, 2019 WL 11769343, at *3 (6th Cir. Nov. 7, 2019) (RLUIPA claims moot after transfer from jail); *Turner v. Schofield*, Case No. 18-5849, 2019 WL 3824185 (6th Cir. Aug. 2, 2019); *Davis v. Michigan Dept. of Corrections*, Case No. 2:18-cv-6, 2019 WL 4686426, at *3 (W.D. Mich. Sept. 26, 2019).

**B. Plaintiff's First Amendment Claims at WCI**

Although Plaintiff's claims for prospective relief at WCI are moot, he also seeks monetary damages under 42 U.S.C. § 1983 for the Defendants' alleged violation of the Free Exercise Clause of the First Amendment. In relevant part, the First Amendment states that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. I. In evaluating whether Defendants are entitled to summary judgment on this remaining free exercise claim, this Court must continuously bear in mind the critical differences that exist between the protections of the First Amendment and the much greater protections that exist under RLUIPA in general, as well as the unique standards that apply to constitutional claims that arise within prison walls. *See Firewalker-Fields v. Lee*, Case No. 19-7497, 2023 WL 192737, at *3, ___ F.4th ___ (4th Cir. Jan. 17, 2023) ("while RLUIPA requires a form of strict scrutiny in the prison context, 42 U.S.C. § 2000cc-1(a), the First Amendment provides less robust protection."); *Turner v. Safley,* 482 U.S. 78 (1987). In the case presented, the latter context is determinative.

### 1.  Plaintiff's Threshold Showing

Before addressing the prison context of Plaintiff's claim, the undersigned first considers Plaintiff's threshold showing of a free exercise violation. See *Kennedy v. Bremerton School District*, 142 S.Ct. 2407, 2421-22 (2022) ("[A] plaintiff may carry the burden of proving a free exercise violation in various ways.").

### a.  Plaintiff's Claim Under the "Substantial Burden" Test

In its prior consideration of summary judgment, this Court applied the threshold test set forth in *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987), in which an inmate is required to show: (1) that the "belief or practice asserted is religious in [his] own scheme of things"; (2) that the belief or practice is "sincerely held"; and (3) that Defendants' conduct infringes upon his belief or practice. *Id.*, 821 F.2d at 1224 (citations omitted). The Court found the record insufficient on the third element – the extent to which "the lack of MSTA congregate services" "infringes" upon or "substantially burdens Plaintiff's practice of religion." (Doc. 31 at 11, PageID 296). Defendants had argued that Plaintiff's MSTA beliefs were not substantially burdened because he could attend generic Muslim services. However, as the Court framed the issue, "the theme underlying [Plaintiff's] arguments is that MSTA is sufficiently different from Islam that it warrants its own congregate religious services." (*Id.*)

In practice, due to textual distinctions between the First Amendment's focus on the "exercise" of "religion" and RLUIPA's different emphasis on "religious exercise," courts often appear to apply a more rigorous "substantial burden" test under the First Amendment. Technically, however, the test "has the same meaning under RLUIPA" as it does for First Amendment free exercise claims. *See Dykes v. Corizon, Inc.*, Case No.

2:22-cv-113, 2022 WL 2900892, at *5 (W.D. Mich. July 22, 2022). In a recent RLUIPA case, the Sixth Circuit defined "substantial burden" this way:

> The Government substantially burdens an exercise of religion when it places substantial pressure on an adherent to modify his behavior and to violate his beliefs or effectively bars his sincere faith-based conduct. This is an individualized inquiry. The substantial-burden question turns on the impact of a government regulation on the individual inmate, not the centrality of those beliefs to canonical texts as interpreted by judges or prison officials.

*Fox v. Washington*, 949 F.3d 270, 278 (6th Cir. 2020) (cleaned up); *see also, generally*, *Lovelace v. Lee,* 472 F.3d 174, 187 (4th Cir. 2006) (defining substantial burden under First Amendment).

At least arguably, the unrebutted supplemented record now shows that Plaintiff's practice of MSTA is not substantially burdened by the lack of sectarian services. For example, MSTA self-identifies as an Islamic movement founded by Noble Drew in 1913. (*See* Doc. 41-2 at PageID 178-179 (MSTA missionary pamphlet containing section "What is Islam."). Consistent with other faiths in the Muslim catchment, MSTA adherents participate in Friday congregate services, worship Allah, and recognize the Prophet Mohammed. (Doc. 41-2 at 1, PageID 347; *see also* Federal Bureau of Prisons Manual at https://www.bop.gov/foia/docs/moorishsciencetemplemanual.pdf (accessed on January 31, 2023). The Imam who provides generic services for the Muslim catchment attests to his familiarity with MSTA, "through reading and through speaking with adherents of the Moorish Science Temple" and has "worked with" inmates of various sects "including adherents of the Moorish Science Temple." (Doc. 41-7 at ¶¶4, 7, PageID 556).

Despite arguments that stress theological differences between Plaintiff's MSTA beliefs and other religions within the Muslim catchment,[16] Plaintiff identifies himself as "Moslem." (Doc. 15-4 at 9, PageID 120). The generic Muslim congregate services are designed to broadly appeal to all faiths within that catchment. There is no evidence that the Imam who led the non-sectarian services did so in a manner that was antithetical to Plaintiff's beliefs.[17] In fact, Plaintiff does not deny that he never attended any of the generic Muslim catchment services while at WCI, and never spoke with the WCI Imam. (Doc. 41-7 at ¶¶ 9-10, PageID 557). Thus, Plaintiff has not shown that having to worship at non-sectarian services among followers of other religions placed within the Muslim catchment substantially detracts from his ability to participate in, or "impinges" upon, his MSTA religion. *Accord Blair-Bey v. Nix*, 963 F.2d 162, 164 (8th Cir. 1992) (policy of providing a single Islamic advisor does not unreasonably impinge on MST inmates' ability to practice their religion" because non-sectarian advisor was "an authority on the Islamic religion" and "qualified by education and experience to serve all the Islamic inmates" including MSTA adherents); *see also Abdur-Rahman v. Mich. Dept. of Corrections*, 65 F.3d 489, 491 (6th Cir. 1995) (holding policy that prevented attendance at sectarian service did not violate First Amendment). And yet, Defendants are not entitled to summary

---

[16]Plaintiff argues that "orthodox" and "Sunni" sects believe that there will be "no Prophet after Muhammad," whereas Plaintiff believes that MSTA's founder was a Prophet after Muhammed. He asserts that the generic WCI services are silent about "the Prophet Noble Drew Ali" and his book, "The Circle 7 Holy Koran of the Moorish Science Temple of America," which differs from the orthodox Koran. (Doc. 42*l*at 14, 16, PageID 573, 575).

[17]In finding MSTA to be generally aligned with the Muslim catchment, the undersigned does not deny the existence of theological differences. Defendant's own exhibits confirm some tensions exist between MSTA (as well as NOI) and more orthodox Islam groups. (*See e.g.*, Doc. 41-2 at 112, PageID 458; Levinson, David, "The Moorish Science Temple in the Upper Housatonic Valley National Heritage Area."). However, the mere existence of sectarian differences does not prove that the offering of only non-sectarian services substantially burdens Plaintiff's exercise of MSTA.

judgment on this threshold issue based on Plaintiff's ability to satisfy an alternative test that establishes his threshold free exercise claim.

### b. Plaintiff's Threshold Claim Under the Neutral and Generally Applicable Test

In *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), the Supreme Court re-affirmed that a threshold free exercise claim is stated if a plaintiff demonstrates  "that a government entity has burdened his sincere religious practice pursuant to a policy that is not, by its content, either 'neutral' or 'generally applicable.'" *Id*., at 2422-23, quoting *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 879-881 (1990); *see also Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868, 1877 (2021). On the record presented, the religious "catchment" policies and the denial of sectarian services within the Muslim catchment were both policies whose "object" is to limit the exercise of religious activity. *Id*. Therefore, the enforcement of the referenced policies is sufficient to establish Plaintiff's threshold claim. Once a plaintiff establishes his threshold claim, the focus shifts to the defendants to justify the challenged action.

### *2.* The Unique Context of Constitutional Claims by Prisoners

The "rational basis" test established in *Turner v. Safley* applies to free exercise claims filed in the prison context. Any other conclusion would be contrary to decades of well-established case law that holds that constitutional rights are subject to reasonable restrictions in the prison context. *See generally, Beard v. Banks*, 548 U.S. 521, 528, 126 S.Ct. 2572 (2006) (plurality opinion) ("[T]he Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere."). *Turner* applies whenever "a prison regulation impinges on inmates' constitutional rights." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400 (1987) (citing *Turner*, 482 U.S. at

89); *Firewalker-Fields v. Lee*, ___ F.4th ___, 2023 WL 192737, at *4 n.2 (4th Cir. Jan. 17, 2023).

In *Turner*, the Supreme Court established that a challenged prison rule that actually impinges upon an inmate's constitutional rights remains valid so long as "it is reasonably related to legitimate penological interests." *Id.*, 482 U.S. at 89. *Turner* emphasizes that deference must be afforded to prison officials, particularly where a state penal system is involved. *See id.* at 85 ("Where a state penal system is involved, federal courts have… additional reason to accord deference to the appropriate prison authorities."). "[S]uch a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.*, 482 U.S. at 89 (quoting *Jones v. North Carolina Prisoner's Union*, Inc., 433 U.S. 119, 128 (1977)); *see also Kent*, 821 F.2d at 1225 ("[T]he determination of state prison authorities as to what are legitimate penological objectives and what regulations and practices further them is entitled to great deference.") (additional citations omitted)).

Under *Turner*, this Court considers four factors. The first - whether there is a "'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it" – is the most important. *Id.* at 89. A regulation cannot stand if "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id*. at 89-90, 107 S. Ct. 2254 (internal citation omitted). However, the Defendants' burden to articulate reasons for its policies is "slight" and "may be a matter of common sense." *Sharp v. Johnson*, 669 F.3d 144, 156 (3rd Cir. 2012). And once the Defendants have articulated a legitimate governmental interest,[18]

---

[18]In its last Order, the Court noted that Defendants "have not provided specific facts about the administrative burdens created by holding an MSTA congregate service." (Doc. 31 at 13-14, PageID 298-299). However,

the burden shifts back to the Plaintiff to disprove it. *Overton v. Bazzetta*, 123 S.Ct. 2162, 2168, 539 U.S. 126, 132 (2003) ("The burden… is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.").

### a.  The First *Turner* Factor Favors Summary Judgment

The purpose of the prison regulation "must be a legitimate and neutral one."[19] *Turner*, 482 U.S. at 90. On the record presented, Defendants have carried their initial burden to articulate legitimate governmental interests for the ODRC policies of: (1) grouping religions within catchments; (2) placing MSTA within the Muslim catchment, and (3) offering only non-sectarian congregate services for the Muslim catchment. Defendants' denial of Plaintiff's request for sectarian services based on the referenced policies conforms with "legitimate and neutral" penological objectives: (1) the minimization of sectarian conflicts and violence between inmates; and (2) the allocation of scarce institutional resources.

### i.     ODRC's Safety and Security Objectives

Pursuant to 72-REG-01, ODRC policy is "to ensure that inmates… may subscribe to any religious belief they choose" while subjecting "Inmate religious practices, as opposed to belief" to "reasonable time, place and manner restrictions."  (Doc. 41-2 at 22,

---

such "specific facts" are relevant only under RLUIPA, where the government must prove it is using the least restrictive means to accomplish a compelling interest. *Holt v. Hobbs*, 135 S.Ct. at 864 (holding that RLUIPA does not permit "unquestioning deference"); *Yellowbear v. Lampert*, 741 F.3d 48, 59-60 (10th Cir. 2014). Defendants bear no such burden under the highly deferential *Turner* standard, in which the burden of persuasion remains firmly on the plaintiff.

[19]Although lack of content neutrality is relevant to Plaintiff's threshold claim, "*Turner* neutrality is not the 'content neutrality' we demand in other areas of First Amendment jurisprudence." *Jones v. Slade*, 23 F.4th 1124, 1136-37 (9th Cir. 2022). Under *Turner*, a court looks at whether the stated *purpose* of the policy and its *application* are "neutral" rather than the content of the policy. *See Hanrahan v. Mohr*, 905 F.3d 947, 956-57 (6th Cir. 2018) (explaining "neutrality's technical meaning in the *Turner* context," and holding that "[d]etermining that specific speech, based on its content, carries a security risk while other speech does not and then drawing a distinction based on this legitimate penological objective satisfies *Turner*'s neutrality requirement."); *see also Abu-Jamal v. Price*, 154 F.3d 128, 133-34 (3d Cir. 1998) ("We analyze content neutrality in the prison context differently than we do for non-inmates.").

PageID 368). Under the same policy, "particular religious practices shall be subject to the legitimate departmental or institutional interests and concerns, including security, safety, health, discipline, rehabilitation, order, and the limitations of and allocation of resources." (*Id.* at 22, 24). Safety and security are not merely "reasonable" penological interests under the *Turner* test but have been recognized to be "compelling" under RLUIPA standards *See Cutter v. Wilkinson*, 544 U.S. 709, 722-725 (2005); *see also Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989) (The legitimacy of the government's interest in prison security is "beyond question.")

Davis attests to the common-sense proposition that permitting any group of inmates to gather for congregate services "poses a significant threat to the safety, security, and good order within institutions," including a "significant concern that these services could be used to push a non-religious or political agenda or even for more detrimental purposes including criminal behavior and racism." (Doc. 41-1 at ¶11).  Thus, an "appropriate corrections officer" must be present at congregate services, which must be held in a secure space.[20] (Doc. 41-1 at ¶ 25).  Congregate services also may not be led by an inmate, and must be under the control of a chaplain or an approved religious services provider who has undergone security screening and training. (Doc. 41-1 at ¶25). It is undisputed that no one completed the requisite paperwork to provide MSTA religious services at WCI during the time that Plaintiff was incarcerated there. (Doc. 15-1 at ¶9, PageID 95-96).

---

[20]In his original Declaration, Defendant Davis expressed concerns about the potential for extremist beliefs among MSTA members (Doc. 15-1 at ¶ 12; *see also* Doc. 41-1 at ¶17).  However, Davis admits in his Supplemental Declaration that the referenced sovereign citizenship ideology is endorsed only by a "radical element" of MSTA followers. (*Id.* at ¶ 17). The undersigned finds no need to consider whether MSTA congregate services pose any greater risk than other sectarian services because Defendants' articulated security concerns for the denial of all sectarian services within the Muslim catchment are reasonable, rational and not arbitrary.

Davis further attests that "various Islamic sects, including MSTA" have requested separate congregate services but that those requests have been denied for "security and safety purposes." (Doc. 41-1 at ¶ 26). Davis, who has a PhD in organizational leadership and change management and has served as the Religious Services Administrator for 7 years, explains that concerns regarding sectarian tensions underlie the institutional decision to provide only "generic" congregate services for religions within the Muslim catchment:

> Within the various religious communities there is always an element that could potentially adhere to a more militant or radical approach to a particular faith. There are well known tensions between the different sects found within Muslim Religious Practices catchment. Those tensions create security concerns within all of the institutions. Allowing one sect of the Muslim Religious Practices catchment to have separate congregant services would increase those tensions and create hostilities between the various sects. Those hostilities will spill over into additional security concerns, such as inmate fighting. The intent of policy 72-REG-0 1, which requires religious providers to teach to the central tenets of a particular faith, is designed with the intent of preventing the opportunity for discord along sectarian distinctions and differences.

(Doc. 41-1 at ¶ 27, PageID 346).  Plaintiff does not dispute that there are tensions among the different religious communities within the Muslim catchment, nor does he offer any evidence to refute Defendant Davis's legitimate penological concerns that allowing separate congregate services would increase such tensions and hostility.

### ii.    ODRC's Allocation of Scarce Resources

In addition to safety and security concerns, Davis attests that the denial of Plaintiff's request pursuant to the referenced policies aligns with the penological goal of reasonably allocating scarce resources. The policy of the organizing faiths within catchments speaks to this well-recognized issue. Davis attests:

> ODRC does not have the capacity to provide individualized congregate services to all religions. Doing so would create a substantial burden on institutions and staff and the required space is simply not available. Furthermore, it is not feasible or economically possible for ODRC to employ a sufficient number of Muslim Imams for each subsect of Islam to preside at all ODRC institutions, and volunteers are not always available. The burden placed on ODRC institutions by providing these services to adherents to Islamic faith alone would be significant.

(Doc. 15-1 at ¶10, PageID 96; *see also* Doc. 41-1 at ¶¶ 22-23, attesting that WCI does not have the resources "to hold separate congregate activities for each denomination of each religion currently being practiced."). "The Supreme Court has long recognized that prisons make do with 'limited resources for preserving institutional order' and thus deserve deference in how they allocate those resources." *Rodriguez v. Burnside*, 38 F.4th 1324, 1331 (11th Cir.  2022) (quoting *Turner*, 482 U.S. at 90); *see also Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (holding that Buddhist inmate had established a threshold claim but that the First Amendment does not require prisons to provide congregate services for every religious sect).

As another court put it:

> There is "valid, rational connection" in the management of facility space and available staff to justify combining services for related faiths. The goal of conserving those limited resources is neither remote, arbitrary, or irrational. Muslim inmates are still able to exercise the right of religious expression, but must do so with other persons who, while sharing general religious believes, also have differing opinions. Indeed, from the dawn of time, communal spiritual worship has frequently involved bringing together people with common or general ideals, but with different views on specific points. Very rarely will a group of people agree on every aspect of faith, theology, and the practical application of such beliefs. Tolerance is required between faith groups that meet within the confines of a prison's walls just as it is required outside of those walls.

*Watkins v. Jones*, Case No. 4:12-cv-215, 2015 WL 5468647, at *15 (N.D. Fla. August 28, 2015), R&R adopted in relevant part and rejected in part at 2015 WL 5468648 (N.D. Fla. Sept. 15, 2015) (granting injunctive relief to inmate on dietary claims).

Plaintiff protests that a volunteer could have provided additional MSTA sectarian services. However, the identified individual never completed paperwork either to appear regularly as a volunteer religious services provider or to be Plaintiff's designated personal clergy of record. And Plaintiff offers nothing to address Defendants' additional concerns with the limited availability of space and additional staff to provide security.

Similar penological justifications for the denial of sectarian services in favor of generic congregate services have consistently been upheld as reasonable. *See Watkins, supra*; *Jones v. Shabazz*, Civil Action No. H-06-1119, 2007 WL 2873042, at *20 (S.D. Tex. Sept 28, 2007) (holding that plaintiff was allowed a reasonable opportunity to practice his religion; prison's structure of grouping multiple sects under the umbrella of Islam was reasonably related to legitimate penological interests); *Boxer X v. Donald,* 169 Fed. Appx. 555, 2006 WL 463243, *3-4 (11th Cir. 2006) (no free exercise or equal protection violations when prison denied sectarian services and instead provided congregational religious services based on "generic abstractions" of actual denominational faiths); *Smith v. Cooley*, Case No. 15-cv-2892, 2017 WL 5178920, at *3 (W.D. La., March 21, 2017), adopted at 2017 WL 5178820 (W.D. La. Nov. 7, 2017) (no free exercise violation where NOI inmate was denied separate sectarian services); *Weir v. Nix*, 890 F. Supp. 769, 788 (S.D.Iowa 1995), *aff'd*, 114 F.3d 817 (8th Cir. 1997) (failure to provide sectarian chaplain or spiritual advisor did not violate free exercise clause).

### b.  The Remaining Turner Factors Favor Summary Judgment

Application of the remaining *Turner* factors leads to the same conclusion. The second *Turner* factor is whether "there are alternative means of exercising the right that remain open to prison inmates." *Id.*, 482 U.S. at 90. Here, the Supreme Court's analysis in *O'Lone v. Estate of Shabazz* is instructive. In *O'Lone*, the Court held that a policy that prevented Muslim inmates from attending a weekly religious service that was central to their faith did not violate the First Amendment in part because they could practice their religion in other ways:

> There are, of course, no alternative means of attending Jumu'ah; respondents' religious beliefs insist that it occur at a particular time. But the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service. While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end. In *Turner,* we did not look to see whether prisoners had other means of communicating with fellow inmates, but instead examined whether the inmates were deprived of "all means of expression." *Id.,* at 92, 107 S.Ct., at 2263. Here, similarly, we think it appropriate to see whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies. The record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations. The right to congregate for prayer or discussion is "virtually unlimited except during working hours," Tr. 182 (testimony of O'Lone), and the state-provided imam has free access to the prison. Muslim prisoners are given different meals whenever pork is served in the prison cafeteria. Special arrangements are also made during the month-long observance of Ramadan, a period of fasting and prayer. ... We think this ability on the part of respondents to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable.

*Id.,* 107 S.Ct. at 2406, 482 U.S. at 351-52.

While at WCI, Plaintiff was free to read and maintain religious materials in his prison cell and could designate and receive visits from an MSTA clergy person of record.

"As long as a prisoner… retains 'the ability to participate in other Muslim religious ceremonies,' the second [*Turner*] factor tips against him." *Rodriguez v. Burnside*, 38 F.4th at 1332 (quoting *O'Lone*, 482 U.S. at 352).

The third *Turner* factor considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.*, at 90. The record strongly suggests that if Plaintiff's request had been granted, it would have had a negative impact on institutional space and staff, and would have been likely to lead to other groups within the Muslim catchment (at a minimum) seeking their own separate sectarian services. "Requesting such a 'significant reallocation' of resources, the Supreme Court has explained, interferes with the smooth functioning of a prison." *Rodriguez v. Burnside*, 38 F.4th at 1332 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003)); *accord Watkins*, 2015 WL 5468647, at *15.

The fourth *Turner* factor requires the court to determine if there are "ready alternatives" to the regulation because "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id*. at 90.  Here, Plaintiff offers no viable alternatives. His "volunteer" religious provider did not complete the requisite paperwork. And Plaintiff fails to address at all Defendants' legitimate safety and security concerns and other limitations on institutional resources. *See DeMarco v. Bynum*, 50 F.4th 479, 483 (5th Cir. 2022) (affirming grant of summary judgment where inmate had not pointed to any alternative that fully accommodated his rights "at de minimis cost to valid penological interests.")

In sum, Defendants are entitled to summary judgment on Plaintiff's free exercise claim under *Turner*.

### C. Equal Protection Claim

It is not entirely clear from the record whether Plaintiff asserts only a free exercise claim under the First Amendment, as made applicable to the states by the Fourteenth Amendment, or whether he is asserting a separate "equal protection" claim under the Fourteenth Amendment. But to the extent that the Equal Protection Clause is at issue, Defendants are entitled to judgment as a matter of law.  Like the plaintiff in *Jones v. Shabazz*, "Plaintiff has not shown an equal protection violation because he has not shown purposeful discrimination by Defendants in their structuring of the Muslim generic services." *Id*., 2007 WL 2873042, at *20.

### D. Qualified Immunity

Even if a reviewing court were to disagree with the foregoing analysis, the undersigned alternatively would recommend that Defendants' motion be granted on the basis of qualified immunity. The purpose of qualified immunity is to provide governmental officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages." *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012 (1984). Thus, a governmental official performing discretionary functions will be entitled to qualified immunity unless his actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). A governmental official is entitled to immunity if the facts alleged do not make out a violation of a constitutional right, or if the alleged constitutional right was not clearly established at the time of the defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808 (2009). Once a defendant has raised the defense of qualified immunity, the plaintiff bears the burden of proof to

show that the defendant is not entitled to that defense. *See Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005).

No Supreme Court or controlling Sixth Circuit case law has ever held within the prison context that providing generic congregate religious services while denying sectarian congregate services based upon valid penological interests violates the free exercise of the First Amendment.  *See generally*, *Taylor v. Nelson*, No. 20-51051, 2022 WL 3044681, at *2 (5th Cir.  2022) (granting qualified immunity to prison officials who did not promulgate the unconstitutional policy but merely enforced it against the plaintiff, because "reasonable officials would not have understood that enforcing the hijab policy was unconstitutional." )

## VII. Conclusion

For the reasons stated herein, it is herein **RECOMMENDED THAT** Defendants' motion for summary judgment (Doc.15) be **GRANTED** and that this case be **CLOSED**.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

STEVEN-AZZIZ EL BEY,                                    Case No. 1:19-cv-693

     Plaintiff,

                                         Dlott, J.
     vs.                                                      Bowman, M.J.

THOMAS KEHR, *et al.,*

     Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).